## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | **Civil Action No. 26-CV-** |
| **v.** | |
| **SUMIT RAI, KIM DE MORA, SVN MED LLC, NVS MED INC., ONCO FILTRATION, INC.,** | |
| **Defendants,** | |
| **and** | |
| **CANCER CHECK LABS, LLC,** | |
| **Relief Defendant.** | |

## COMPLAINT

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges the following against defendants Sumit Rai ("Rai"), Kim de Mora ("de Mora"), SVN Med LLC ("SVN Med"), NVS Med Inc. ("NVS Med"), and Onco Filtration, Inc. ("Onco" and collectively with Rai, de Mora, SVN and NVS, "Defendants") and Relief Defendant Cancer Check Labs, LLC ("Cancer Check"):

## SUMMARY

1.      This case involves fraud by Rai and his companies, SVN Med, NVS Med and Onco. Rai and SVN Med were aided and abetted by Defendant de Mora, who, at the relevant time, was the Chief Executive Officer ("CEO") of SVN Med. Rai, SVN Med and NVS Med made misrepresentations and engaged in a fraudulent scheme to strip investor money from SVN Med and NVS Med and use those funds for Rai's personal expenses and for unrelated business endeavors. In total, Rai, SVN Med and NVS Med misappropriated about $10.6 million from investors between approximately July 2020 and April 2023 (the "Relevant Period").

2.      SVN Med, NVS Med and Onco issued securities to investors at various times between November 2019 and about September 2023.  Rai facilitated all of these offerings and de Mora facilitated the offerings by at least SVN Med.  In total, through these private securities offerings, Defendants raised more than $26 million from over 180 investors.  Many of these investors were individuals.

3.      All three companies, SVN Med, NVS Med and Onco, told investors that their primary business was developing a method and device to filter "circulating tumor cells" out of a patient's bloodstream.  At various times, the Defendants claimed that their method and device were: (1) a way to *treat or prevent* the spread of cancer, or (2) a way to *diagnose* cancer, or (3) a way to *screen* for the presence of cancer.  Some investment materials provided to investors summarized the technology as a form of "cancer dialysis."

4.      Instead of using the majority of investors' funds to develop that technology, Rai misappropriated at least $10.6 million in investor funds for his personal use.  For example, of that $10.6 million, Rai withdrew approximately $5.1 million in cash, paid about $2,300,000 he owed on his personal credit cards, paid at least $1 million in unrelated debts incurred by one of his business associates, and purchased $850,000 worth of luxury vehicles for an "elite social club" he attempted to start.

5.      In the course of soliciting investments, Rai and his companies made numerous false or misleading statements to investors about how their funds would be used to develop the technology touted by SVN Med, NVS Med and Onco.  Rai and his companies made numerous statements about how investors' funds would be used for research and development and the clinical trials and other regulatory work necessary to obtain approval to make and sell a medical device in the United States and Europe.  These statements were false and misleading because a

substantial portion of investors' funds were misappropriated.

6.      As explained in more detail below, Rai and his companies solicited investors to change the form of their investments on a number of occasions.  Ultimately, all investors in SVN Med and NVS Med became investors in Onco through a series of assignments and conversions of their convertible promissory notes.

7.      Then, in September 2023, Rai induced investors to exchange their convertible promissory notes (all then payable by Onco) for non-convertible promissory notes payable by Onco.  The first payment on these notes was due on December 31, 2024, but was not paid because Rai unilaterally extended the payment date on those notes.  Through at least August 2025, Rai and Onco have made no payments on those notes, which have a current face value of at least $210 million and carry interest at approximately 4%.

8.      Further, in connection with the transactions by which Rai and Onco purchased investors' convertible promissory notes in September 2023, Rai and Onco made misleading statements to investors about Onco's anticipated sales.  Rai and Onco also concealed that Rai had formed a new company, Cancer Check, that benefitted by obtaining the exclusive right to sell Onco's products without an obligation to pay for those products until an indeterminate future date.

9.       Cancer Check claims it has received about $1 million in revenue. That revenue results from selling a blood test to patients using Onco's products, but Cancer Check has not made any payments to Onco for those products.  Cancer Check has thus received a benefit from Onco, at the expense of Onco investors, to which it is not entitled.

10.      As a result of the conduct alleged herein, Rai, SVN Med, NVS Med, and Onco violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the

Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder [15 U.S.C. §78j(b); 17 C.F.R. §240.10b-5] and Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77q(a)]. Also, de Mora aided and abetted Rai's and SVN Med's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder and Section 17(a) of the Securities Act. Further, Relief Defendant Cancer Check received property misappropriated from Defendants' investors, which in equity it is not entitled to retain.

11.     Based on these violations, the Commission seeks: (1) from all Defendants, permanent injunctions enjoining them from engaging in the transactions, acts, practices, and courses of business of the type alleged in this Complaint in violation of the federal securities laws; (2) from Defendants Rai, de Mora, SVN Med and NVS Med, disgorgement of ill-gotten gains from the unlawful conduct set forth in this Complaint pursuant to Sections 21(d)(5) and (7) of the Exchange Act [15 U.S.C. §78u(d)(5), (7)], together with prejudgment interest; (3) from Defendants Rai and de Mora, civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)], (4) from Defendants Rai and de Mora, officer and director bars pursuant to Section 20(e) of the Securities Act [15 U.S.C. §77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. §78u(d)(2)]; (5) from Defendant Rai, an injunction specifically prohibiting him from participating in the issuance, purchase, offer or sale of any security with certain exceptions, and such other relief as the Court may deem appropriate.

12.     The Commission also seeks, against Relief Defendant Cancer Check, disgorgement of its ill-gotten gains together with prejudgment interest thereon, and such other relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to Sections 20(d)(1) and 22(a) of the Securities Act [15 U.S.C. §77t(d)(1), 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C §§78u(d), 78u(e) and 78aa].

14.     Venue is proper in this Court pursuant to Section 22 of the Securities Act [15 U.S.C. §77v(a)] and Section 27 of the Exchange Act [15 U.S.C §78aa].  Defendant de Mora resides in the District of Massachusetts.  Also, Defendants SVN Med, NVS Med and Onco had their principal places of business in the District of Massachusetts during the Relevant Period.  Also, certain of the acts, practices, transactions and courses of business constituting the violations alleged in this Complaint occurred within the District of Massachusetts, and were effected, directly, or indirectly, by making use of the means or instrumentalities of transportation or communication in interstate commerce, or the mails, including the internet and the telephone.

15.     Defendants' conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

## DEFENDANTS AND RELIEF DEFENDANT

16.     Sumit Rai, age 47, resides in Dallas, Texas.  During at least a portion of the Relevant Period, Rai was an officer of Defendants SVN Med, NVS Med, and Onco.  Rai is currently the Chief Executive Officer ("CEO") of NVS Med and Onco.  Rai is also the CEO, Founder and Chairman of Cancer Check.

17.     Kim de Mora, age 42, resides in North Billerica, Massachusetts.  de Mora was the CEO of SVN Med from June 2019 to March 2022.  Thereafter, he was a founder of Onco and was employed as its Vice President of Technology until early 2025.

18.     SVN Med LLC is a Delaware limited liability company.  During most of the Relevant Period, its principal place of business was in Woburn, Massachusetts.  It now appears to have a principal place of business in Dallas, Texas.  Rai formed SVN Med on April 5, 2019.  SVN Med is currently a wholly-owned subsidiary of NVS Med.  At all relevant times, Rai has exercised control over the business of SVN Med.

19.     NVS Med Inc. is a Delaware limited liability company with a principal place of business in Woburn, Massachusetts.  Rai formed NVS Med on February 23, 2021.  NVS Med is the parent company of SVN Med and, when it was formed, was owned by Rai (62.5%), de Mora (25%) and Person A, who is another business associate of Rai's (12.5%).  NVS Med is purportedly a holding company that has no employees or contractors.  At all relevant times, Rai has exercised control over the business of NVS Med.

20.     Onco Filtration, Inc., formerly known as SVN Med Therapeutics LLC, is a Delaware corporation.  During a portion of the Relevant Period, its principal place of business was in Woburn, Massachusetts.  Its principal place of business is now Dallas, Texas.  Onco is a wholly-owned subsidiary of SVN Med.  Rai and de Mora co-founded Onco.  At all relevant times, Rai has exercised control over the business of Onco.

21.     Cancer Check Labs LLC is a Delaware limited liability company with a principal place of business in Dallas, Texas.  Rai formed Cancer Check on September 26, 2023.  Cancer Check is owned two-thirds by Rai and one-third by Person A.  At all relevant times, Rai has exercised control over the business of Cancer Check.

## FACTUAL ALLEGATIONS

**Investments in Defendants SVN Med, NVS Med and Onco**

22.     Before 2019, Rai worked in a series of venture capital and private equity firms which provided funding for small private companies.  Rai also founded, and served as an officer of, three other companies in the mobile advertising, data insights and baby products industries.

23.     Between 2019 and at least 2023, Rai solicited investments in SVN Med, NVS Med and Onco.  As described in further detail below, investors in all three companies had their investments recharacterized as investments in Onco.

24.     In 2019, Rai began soliciting investments in SVN Med.  SVN Med's investment materials described the company as a cancer dialysis company that was capable of filtering more than twice an average patient's entire blood volume.

25.     Between 2019 and July 2021, SVN received investments from approximately 100 investors collectively totaling about $11 million.  These investments took the form of convertible promissory notes issued by SVN Med (which were convertible into SVN Med equity).

26.     In February 2021, Rai incorporated NVS Med, and between March and September 2021, solicited investors to assign their convertible promissory notes that had been payable by SVN Med (and convertible into shares of SVN Med stock) to convertible promissory notes that would be payable by NVS Med (and convertible into shares of NVS Med stock).  All of the approximately 100 SVN Med investors appear to have agreed to these assignments.  On September 13, 2021, SVN Med became a wholly owned subsidiary of NVS Med.

27.     In 2021 and 2022, Rai solicited new investments into NVS Med.  Between September 2021 and October 2022, approximately 60 investors invested a total of approximately

$8.1 million in NVS Med, in the form of convertible promissory notes that were convertible into shares of NVS Med in defined circumstances.

28.     In March 2022, Rai orchestrated the name change of a former subsidiary of SVN Med to Onco.  Thereafter, Rai and de Mora solicited investors in NVS Med to exchange their shares of, or convertible promissory notes payable by, NVS Med to shares of, or convertible promissory notes payable by, Onco.  As part of these exchanges, Rai and de Mora offered to investors a four times increase in the value of their notes.  In other words, they offered an investor holding an NVS Med note with a balance of $250,000 a replacement note that would be payable by Onco with a balance of $1,000,000.  All of the prior investors appear to have agreed to these exchanges into Onco investments by September 2022.

29.     Beginning in April 2022, Rai began soliciting new investments in Onco. Approximately 70 investors invested a total of approximately $7.5 million in Onco.  Some of these investors made their investments in the form of convertible promissory notes that were convertible into shares of Onco in defined circumstances.  Other of these investors purchased Onco stock, or options to purchase Onco stock.

30.     About one year later, Rai induced Onco investors to agree to another exchange of promissory notes.  In this exchange, which was effective as of about September 1, 2023, Rai and Onco offered investors a 2.5 times increase in the face value of their promissory notes if the investors exchanged their convertible promissory notes payable by, and convertible into shares of, Onco for new non-convertible promissory notes that were payable by Onco.  In other words, an investor holding a convertible promissory note with a balance of $1 million would receive a non-convertible promissory note with a balance of $2.5 million.

31.    Rai told investors that they did not have a choice in agreeing to this note exchange, stating that it is a "foregone conclusion."  These new promissory notes stated that they had a four-year payment term and that annual installment payments were due beginning on December 31, 2024.  However, the new notes also contained a provision that allowed Rai or Onco unilaterally to extend the payout dates.  Rai exercised this provision and did not make payments to any investors holding these notes on December 1, 2024, when the first payments were originally due.

32.    As a result of the various promissory note exchanges described in paragraphs 26 through 31 above, investors who originally invested in convertible promissory notes or stock of SVN Med, NVS Med and Onco became investors in non-convertible promissory notes issued and payable by Onco.  In total, Rai raised money for these three companies from approximately 180 unique note-holding investors, who collectively invested about $26.7 million.  Many of these investors were individuals.

**Defendants Told Investors That Their Funds Would be Used for Corporate Purposes and to Develop and Seek Regulatory Approval for The Companies' Medical Device.**

33.    The Note Purchase Agreements signed by SVN Med investors who invested in convertible promissory notes in 2019 and 2020 typically provided, in a "Use of Proceeds" section, that "[t]he proceeds of the sale and issuance of the Notes shall be used for general corporate purposes and working capital."

34.    In 2020, Rai also provided existing and prospective SVN Med investors with investment pitch materials that described SVN Med's business as the development of a medical device capable of filtering a patient's "entire blood volume" to remove circulating tumor cells thereby inhibiting cancer metastasis.  The company stated that its development steps were: in six months to recreate its animal safety trial, in one year to demonstrate human safety and in

eighteen months to achieve CE mark approval (the approval necessary to sell medical devices in Europe). The company described the use of proceeds from the $2 million in convertible notes it was offering as including research and development for the medical device and its consumables, regulatory costs, salaries, professional fees, interest expenses and G&A (general and administrative). G&A represented approximately 3% of the total of $5 million that SVN was looking to raise through its securities offering.

35.    Similarly, in November 2020, Rai and de Mora informed at least three prospective investors that the $10 million in investments they were then in the process of raising would be used for both animal and human clinical trials to obtain a CE Mark for SVN Med's device.

36.    The Note Purchase Agreements signed by NVS Med investors who invested in convertible promissory notes during portions of 2021 and 2022 typically provided, in a "Use of Proceeds" section, that "[t]he proceeds of the sale and issuance of the Notes shall be used for general corporate purposes and working capital."

37.    While Rai and de Mora were soliciting investments in NVS Med, their investment materials continued to tout SVN Med's technology. During this time, Rai told investors that the company had launched its efforts for CE Mark approval, that its goals for the fourth quarter of 2021 included drafting an FDA Breakthrough Application, and provided a timeline for regulatory activities that would result in anticipated FDA approval in the third quarter of 2023.

38.    The Note Purchase Agreements signed by Onco investors who invested in convertible promissory notes during this period typically provided, in a "Use of Proceeds" section that "[t]he proceeds of the sale and issuance of the Notes shall be used for general corporate purposes and working capital."

39.    In 2022, Rai, copying de Mora, also emailed to existing and prospective Onco

investors investment pitch materials that claimed Onco had developed a device that allowed it to filter "unparalleled volumes of circulating tumor cells from whole blood."  Rai and Onco touted Onco's pre-clinical process as "actively in process and on track to be completed this year in 2022."  They further claimed that Onco's animal and human clinical work would be complete in 2023 and they expected FDA clearance for commercial use by the end of 2023.  They also estimated Onco's expenses in 2022 and 2023 would be primarily in the areas of "research & development" and "regulatory & quality" with smaller expenses in the areas of legal/human resources and general/administrative.  Rai also informed investors that Onco expected initial commercial sales of its device in 2024 and that it was working to become publicly traded on the NASDAQ stock market.

**Instead of Using Investors' Funds as Promised, Rai Misappropriated a Substantial Part of Those Funds to Obtain a Personal Loan and then Pay Off that Loan.**

40.     Rather than using investors' funds as they represented, Rai, SVN Med and NVS Med used, or allowed Rai to use, a significant percentage of those funds as collateral to obtain a personal line of credit/loan from Bank A (the "Loan") in 2020.  Rai used the Loan for a variety of personal purposes unrelated to the use of funds that had been represented to investors, and Rai later paid off the Loan using investors' money.

41.     On or about July 8, 2020, Rai signed an Application for the Loan with Bank A that would provide Rai with a personal line of credit that could be withdrawn in an amount up to 95 percent of the value of the accounts that were pledged as collateral for the Loan.  Rai signed the application as the "Borrower" and stated that the purpose of the Loan was "general liquidity purposes."

42.     Rai also signed the Loan Application as the "Pledgor" because the account that was pledged as collateral for the Loan was a brokerage account owned by SVN Med, which was

substantially funded by investor money.  In the Loan Application, Rai falsely represented that SVN Med was a holding company rather than an operating company and that he owned 100% of SVN Med.  At the time he signed the Loan Application, Rai knew or was reckless in not knowing that both of those statements were false.  At the time, Rai owned only 30.5% of SVN Med.

43.     Part of the Loan Application submitted to Bank A was a "Limited Liability Company Authorization for Loan Management Account," which was signed by both Rai and by de Mora, in his capacity as CEO and Founder of SVN Med.  That authorization document, on which Bank A stated it was relying in making the loan, represented that SVN Med authorized Rai to enter into the Loan and pledged SVN Med's account as collateral for that Loan.

44.     At the time de Mora signed this authorization agreement that was part of the Loan Application, he knew or was reckless in not knowing that Rai's statement about being the 100% owner of SVN Med was false.  de Mora knew this because he was, at the time, the owner of 12% of SVN Med and had signed SVN Med's LLC agreement, which demonstrated that the company had at least six owners at the time it was formed and at the time of the Loan.

45.     At the time Rai entered into the Loan Agreement, and throughout the time that the Loan account was open, the SVN Med account that was pledged as collateral for the Loan contained primarily investor funds from investments in both SVN Med and NVS Med.

46.     On the basis of the Loan Application, Bank A approved the personal Loan to Rai that permitted him to borrow up to 95% of the value of the SVN Med account that was pledged as collateral for the Loan.  The Loan did not have a specific due date, but Bank A could require repayment at any time.

47.     The Loan Agreement also required Rai to pay interest on the outstanding Loan balance at the end of each month.  Frequently during the life of the Loan, Rai paid the accumulated monthly interest by authorizing Bank A to take money from the pledged SVN Med account.  Each time he did so, SVN Med investors' funds were misappropriated to pay for the costs of Rai's personal Loan.  Over the life of the Loan, Rai paid approximately $680,000 in interest charges on the Loan, primarily from charges to the SVN Med pledged account.

48.     Rai first drew on the Loan on July 16, 2020 and periodically continued to draw on it from July 2020 to April 2023.  Frequently, Rai transferred funds withdrawn from the Loan to his personal bank account.  Approximately 75% of the funds in Rai's personal account during the time period of July 2020 to January 2023 originated from the Loan account.  The remaining 25% of funds in Rai's personal account were derived from individuals who made additional personal loans to Rai and $500,000 from an investor in SVN Med.  Many of the individuals who made personal loans to Rai were also investors in SVN Med, NVS Med or Onco.

49.     During the time that Rai drew on the Loan, he repeatedly informed staff at Bank A that the Loan funds were used for his "general liquidity."  Rai also told staff at Bank A that he used the Loan proceeds for his personal needs: to renovate his home, to buy a collectible car, to invest in private companies and real estate, and for legal and entertainment expenses for his businesses other than SVN Med, NVS Med and Onco.  In August 2020, Rai also falsely told Bank A personnel that he was using Loan proceeds to make a $200,000 loan to an anesthesiologist friend to help start a new business venture.  In truth, those funds were used to pay off a personal debt of one of Rai's business associates (see paragraph 51.d below).

50.     Despite his statements to Bank A personnel that the Loan proceeds were used for various personal purposes, Rai later claimed that he used the Loan Proceeds for "business development" expenses of SVN Med, NVS Med and/or Onco.

51.     In actuality, however, Rai did not use the Loan proceeds for business development for SVN Med, NVS Med or Onco.  Instead, Rai used the Loan proceeds as follows:

    a.  Rai paid about $2.3 million in credit card bills (substantially from Loan proceeds) for himself and a business associate, Person B.  Person B was purportedly connected to celebrities and wealthy individuals.  Charges on the credit card bills that were paid substantially from Loan proceeds included: approximately $1.6 million spent at restaurants, approximately $350,000 spent on clothing, jewelry and accessories, approximately $70,000 spent on alcohol, and approximately $107,000 spent on home furnishings and exercise equipment.

    b.  Rai withdrew approximately $5.1 million in cash from the Loan.  Rai gave a substantial portion of this cash to Person B to spend on restaurants, nightclubs and entertainment.  Rai later asserted that the "splash" of using cash would purportedly attract celebrities and investors to his companies.  Rai did not document these cash expenditures and also asserted that he often observed the spending of this cash when he was with Person B.

    c.  Rai used approximately $850,000 in Loan proceeds to purchase luxury vehicles for a "private elite social club in Manhattan" that Rai and Person B were founding.  This private social club never opened.

d.  Rai paid approximately $1 million of Person B's non-credit card debts using his personal account (that was substantially funded by Loan proceeds).

e.  Rai used approximately $1.5 million in his personal account (that was substantially funded by Loan proceeds) to make equity investments in his own name in SVN Med and Onco that increased his ownership percentage.

f.  Rai spent approximately $85,000 over two days at two strip clubs in Texas. These expenses were charged to Rai's credit card, the bills for which were ultimately paid primarily using Loan proceeds.

g.  Rai used Loan proceeds to make a $22,500 loan to de Mora in December 2022.  This loan was not documented at the time it was made.

52.  At least once during the time the Loan was outstanding, Bank A contacted de Mora, as the CEO of SVN Med, seeking his approval of Loan withdrawals, including a large cash withdrawal.  de Mora approved the cash withdrawal, but did not seek or obtain from Rai disclosures as to why the withdrawals were being made, or the purposes for which Rai was using the money he withdrew.  de Mora did not ask for, or obtain, documentation of the sums Rai was spending for which SVN Med's account was pledged.  de Mora understood that he had a duty to SVN Med's investors to act in their best interests but he failed to do so.  de Mora's actions were at least reckless given his role and duties as the CEO of SVN Med.

53.  Throughout the period of time that the Loan was open, on average, the outstanding balance of the Loan represented about 88% of SVN Med's and/or NVS Med's available cash balances.

54.  Bank A demanded that Rai repay the Loan on April 6, 2023.  At that time, the outstanding balance of the Loan was approximately $10.6 million.

55.    On April 11, 2023, Rai misappropriated approximately $10.6 million from investors in SVN Med and NVS Med when he used the SVN Med pledged account to pay off the Loan.  At the time, SVN Med's pledged account contained only investor funds.  Rai did not tell investors that he had used their funds to pay off his personal Loan.

56.    de Mora assisted Rai in using investor funds to repay the Loan. As CEO of SVN Med, he signed off on using SVN Med's investor funds in its pledged account to pay off the Loan.  At the time he did so, de Mora had not sought or obtained from Rai any disclosure about how Rai had spent the Loan proceeds.  de Mora abandoned his duty to SVN Med investors and merely acted as a rubber stamp for the use of company funds that Rai requested.  In doing so, de Mora substantially assisted in Rai's misappropriation from SVN Med and NVS Med investors.

**57.**    Further, after SVN Med's bookkeepers asked de Mora for details about using SVN Med's pledged account to repay Rai's Loan, de Mora forwarded their email to Rai and asked Rai what he should say.  Rai told de Mora to tell the bookkeepers that the payment was a loan to Rai (the "Rai Loan") and that the Rai Loan could be booked as an asset of the company. de Mora did not question Rai's response.  The existence of the RaiLoan  on the companies' books was not disclosed to investors. Further, de Mora failed to document the Rai Loan.  There were thus no repayment terms or obligations, and Rai has not repaid any portion of the Rai Loan. In accepting Rai's instructions to the bookkeepers about the Rai Loan and failing to ensure that the companies and their investors were protected, de Mora abandoned his duties as SVN Med CEO and substantially assisted in Rai's misconduct.

**Defendants Misled Investors About the Misappropriation of Their Funds.**

58.    Defendants made materially false and misleading statements to certain investors about the fact that SVN Med's main brokerage account was pledged as collateral for Rai's

personal Loan.

59.    One institutional investor made an investment of $315,000 in SVN Med in December 2020.  This investor obtained a convertible promissory note (convertible into shares of SVN Med) in exchange for its funds.  As part of its "confirmatory diligence" prior to making its investment, this investor learned that SVN Med held its cash in a brokerage account, commented that such an arrangement was unusual, and requested a copy of that brokerage account statement.

60.    Instead of sending that investor a true and accurate copy of the brokerage account statement, Rai altered the copy of the statement he sent to the investor to remove information showing that SVN Med's account was pledged as collateral for his personal Loan.  Specifically:

   a.    the actual account statement includes a line in the address block, on two separate pages in the statement, that reads "Pledged to [] Lender."  On the copy that Rai emailed to the investor, this notation does not appear and there is, instead, a blank space in the middle of the address block;

   b.    the third page of the actual account statement, which shows the account's "net portfolio value" of $6,477,798.88, includes the following disclosures: (1) "[t]his account is pledged as collateral to the LMA for SUMIT RAI.  LMA Closing Monthly Loan Balance (as of Nov. 30, 2020) is $6,048,969.72*"; and (2) "**\* NOTICE TO PLEDGORS**: If the Borrower does not pay the debt, your pledged assets may be liquidated and the proceeds used to pay the Borrower's debt."  On the copy of the account statement that Rai emailed to the investor, neither of those disclosures appears, and there is, instead, a blank space where they were located.

61.    A second institutional investor made an investment of $3 million in SVN Med in July 2020.  This investment was structured as a combination of debt financing and convertible promissory notes, which gave the investor rights to obtain warrants, the exercise of which would entitle the investor to shares equal to 1.7% of SVN Med.  The debt financing was available to SVN Med in three tranches, the third tranche becoming available when SVN Med had raised $2 million from other investors.

62.    As part of its investment process, this investor required SVN Med to complete periodic "compliance certificates."  Defendants Rai, de Mora, and SVN Med submitted three misleading compliance certificates to this investor that concealed the important fact that SVN Med's brokerage account was pledged as collateral for the Loan.

63.    Specifically, the compliance certificate that was required as part of the closing of the investor's initial investment did not disclose the existence of SVN Med's brokerage account at all.  The compliance certificate, which was signed on or about July 27, 2020 by de Mora as SVN Med's CEO, required SVN Med to certify that "as of the date hereof, it maintains only those deposit and investment accounts set forth below . . . ."  Though de Mora listed two SVN Med bank accounts, he did not list the SVN Med brokerage account that was pledged as collateral for Rai's personal Loan.  At the time he signed this compliance certificate, de Mora knew about the SVN Med brokerage account because earlier that month, he had signed documents permitting the pledge of that account for Rai's personal Loan.

64.    Second, on or about September 11, 2020, Rai sent the investor a second compliance certificate in connection with borrowing the final $1 million tranche and providing the final set of warrants.  This compliance certificate disclosed the existence of the SVN Med brokerage account but did not provide any indication that the account was pledged as collateral

for Rai's personal Loan.  Further, the compliance certificate misrepresented that SVN Med then had $3,655,633.80 as the "balance of unrestricted cash."  However, at the time, SVN Med kept the majority of its cash in the SVN Med brokerage account that was pledged as collateral for Rai's personal Loan and thus, this cash was not "unrestricted."  At the time of this representation, more than 92% of the "unrestricted cash" that SVN Med reported was actually restricted.

65.    Had the investor known the truth – that almost all of SVN Med's reported "unrestricted cash" was actually pledged as collateral for a personal loan, it would not have provided this additional tranche of financing in September 2020.

66.    Third, on or about August 29, 2022, Rai signed another compliance certificate that was required by the investor.  This compliance certificate disclosed the existence of the SVN Med brokerage account but did not provide any indication that the account was pledged as collateral for Rai's personal Loan.  Further, the compliance certificate represented that SVN Med then had $10,991,342 as the "balance of unrestricted cash."  However, at the time, SVN Med kept the majority of its cash in the SVN Med brokerage account that was pledged as collateral for Rai's personal Loan and thus, this cash was not "unrestricted."  At the time of this representation, 89% of the "unrestricted cash" that SVN Med reported was actually restricted.

**Defendant de Mora Profited from Purported Loans.**

67.    Defendant de Mora also benefitted personally from his positions with SVN Med, NVS Med and Onco by taking $150,000 in three purported "loans" from those companies. Specifically: (1) while de Mora was CEO of SVN Med, he caused the company to "loan" him $50,000 on January 13, 2021; (2) on November 8, 2022, NVS Med (which was then the parent

company of SVN Med) "loaned" de Mora another $50,000; and (3) on July 18, 2023, Onco

"loaned" de Mora another $50,000.

68.     None of these three purported loans were documented.  None of these three loans

was disclosed to investors.  None of these three loans had repayment terms or a repayment

schedule.  None of these three loans had an agreed-upon interest rate.  de Mora has not repaid

any of these purported loans.  At the time they were made, each of these purported loans

represented a substantial portion of de Mora's annual salary.

**Relief Defendant Cancer Check Benefitted Financially From Onco's Property.**

69.     In September 2023, Rai formed a new company named Cancer Check.  Rai owns

two-thirds of Cancer Check, and the remaining third is owned by one of Rai's business partners.

70.     In connection with the Onco promissory note conversion in September 2023, Rai

and Onco informed investors that Onco was changing direction.  Rather than proceeding towards

an initial public offering of securities with a business focused on the cancer dialysis device that

would undergo CE Mark and FDA approval processes, Rai and Onco told investors that the

company was planning to market and sell a test for diagnosing cancer from circulating tumor

cells.  Rai and Onco also told investors that sales of its diagnostic tests were "anticipated to start

in January 2024," and that Onco "should become cash-flow positive shortly after sales" began.

71.     At the time of these statements, Rai knew that Onco would not be the company

making sales of its product to the public and that he intended to create another company to make

those sales.  These statements were misleading because they did not disclose that Rai had a

conflict of interest because he controlled both companies or that he was planning to cause Onco

to sell its test supplies to another company he controlled, Cancer Check, and that Cancer Check

would have no documented obligation to pay Onco for those test supplies.

72.    Onco sold the tests it manufactured to Cancer Check, rather than directly to the public.  Though Cancer Check's sales to the public were supposed to fund repayments to the Onco investors holding promissory notes, as of January 29, 2025, there were no documents showing Onco's sale of any products it manufactured to Cancer Check, such as sales agreements, invoices, payment confirmations or receipts.

73.    Then, on July 30, 2025, Rai produced for the first time a purported contract between Onco and Cancer Check that documented the parties' sales relationship and was backdated to June 1, 2024.  This "Exclusive Supplier Agreement," between two companies owned and controlled by Rai, provided that Onco could *only* sell its products to Cancer Check, that Cancer Check would *only* pay Onco 20% of the price for which Cancer Check sold its cancer screening blood test to a customer, and that Cancer Check has no obligation to pay Onco for the products it sells to Cancer Check until Cancer Check becomes "cash flow positive."

74.    Cancer Check purports to have received at least $915,000 in revenue from selling products manufactured by Onco to customers.  However, at least as of September 2025, Cancer Check has not paid Onco for any of the test kits it sold.  Thus, Cancer Check received a financial benefit from selling Onco's technology to customers that it is not, in equity, entitled to retain. Onco investors have been harmed because the revenue that is supposed to repay their promissory notes has been appropriated for the financial benefit of Cancer Check and Rai, its majority owner.

## FIRST CLAIM FOR RELIEF
## FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder by Defendants Rai, SVN Med, NVS Med and Onco**

75.    Paragraphs 1 through 74 above are re-alleged and incorporated by reference as if

fully set forth herein.

76.     By reason of the conduct described above, Defendants Rai, SVN Med, NVS Med and Onco, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly, or recklessly, (i) employed devices, schemes, or artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

77.     The conduct by Defendants Rai, SVN Med, NVS Med and Onco, involved fraud, deceit, manipulation or deliberate or reckless disregard of regulatory requirements and directly or indirectly resulted in substantial losses to other persons.

78.     By reason of the conduct described above, Defendants Rai, SVN Med, NVS Med and Onco, violated Exchange Act Section 10(b) [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R §240.10b-5] thereunder.

## SECOND CLAIM FOR RELIEF
## <u>FRAUD IN THE OFFER OR SALE OF SECURITIES</u>

**Violations of Sections 17(a) of the Securities Act by Defendants Rai, SVN Med, NVS Med and Onco**

79.     Paragraphs 1 through 74 above are re-alleged and incorporated by reference as if fully set forth herein.

80.     By reason of the conduct described above, Defendants Rai, SVN Med, NVS Med and Onco, directly or indirectly, in connection with the offer or sale of securities, by the use of

the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting intentionally, knowingly, recklessly, or negligently: (i) employed devices, schemes, or artifices to defraud; (ii) obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading; or (iii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

81.     By reason of the conduct described above, Defendants Rai, SVN Med, NVS Med and Onco violated Securities Act Sections 17(a) [15 U.S.C. §77q(a)] and will continue to violate that section unless enjoined.

### THIRD CLAIM FOR RELIEF
### AIDING AND ABETTING

**Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder by Defendant de Mora**

82.     Paragraphs 1 through 74 above are re-alleged and incorporated by reference as if fully set forth herein.

83.     By reason of the conduct described above, Defendants Rai and SVN Med, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading and/or (iii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers

of the securities.

84.    de Mora knowingly or recklessly provided substantial assistance to Defendants Rai and SVN Med in their violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

85.    As a result, per Section 20(e) the Exchange Act [15 U.S.C. §78t(e)], de Mora violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

**FOURTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**

**Aiding and Abetting Violations of Section 17(a) of the Securities Act by Defendant de Mora**

86.    Paragraphs 1 through 74 above are re-alleged and incorporated by reference as if fully set forth herein.

87.    By reason of the conduct described above, Defendants Rai and SVN Med, directly or indirectly, in the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; (ii) obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading; and/or (iii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

88.    de Mora knowingly or recklessly provided substantial assistance to Defendants Rai and SVN Med in their violations of Section 17(a) of the Securities Act.

89.    As a result, per Section 15(b) of the Securities Act [15 U.S.C. §§77o(b)], de Mora

violated Section 17(a) of the Securities Act.

**FIFTH CLAIM FOR RELIEF**
**OTHER EQUITABLE RELIEF, INCLUDING**
<u>**UNJUST ENRICHMENT AND CONSTRUCTIVE TRUST**</u>

**As to Relief Defendant Cancer Check**

90.     Paragraphs 1 through 74 above are re-alleged and incorporated by reference as if fully set forth herein.

91.     Section 21(d)(5) of the Exchange Act states, "In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."

92.     Relief Defendant Cancer Check received ill-gotten funds by means of receiving property that belongs to investors in SVN Med, NVS Med and Onco.  Cancer Check has no legitimate claim to this property.  In equity and good conscience, Cancer Check should not be allowed to retain such assets and funds.

93.     As a result, Cancer Check is liable for unjust enrichment and should be required to return its ill-gotten gains, in an amount to be determined by the Court.  The Court should also impose a constructive trust on the ill-gotten gains in the possession of Cancer Check.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, the Commission respectfully requests that this Court:

A.     Permanently restrain Defendants, their agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. §§78j(b)] and Rule 10b-5 thereunder [17 C.F.R §240.10b-5] by

using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security: (a) to employ any device, scheme, or artifice to defraud; (b) to make any untrue statement of a material fact, or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person by, directly or indirectly, (i) creating a false appearance or otherwise deceiving any person, or (ii) disseminating false or misleading documents, materials, or information or making, either orally or in writing, any false or misleading statement in any communication with any investor or prospective investor, about: (A) any investment strategy or investment in securities, (B) the prospects for success of any product or company, (C) the use of investor funds, (D) compensation to any person, (E) Defendant's qualifications to advise investors; or (F) the misappropriation of investor funds or investment proceeds.

B.    Permanently restrain Defendants, their agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal services or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. §§77q(a)], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in the offer or sale of any security: (a) to employ any device, scheme, or artifice to defraud; (b) to obtain money or property by means of any untrue statement of a material fact, or any omission of a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser by, directly or

26

indirectly, (i) creating a false appearance or otherwise deceiving any person, or (ii) disseminating false or misleading documents, materials, or information or making, either orally or in writing, any false or misleading statement in any communication with any investor or prospective investor, about: (A) any investment strategy or investment in securities, (B) the prospects for success of any product or company, (C) the use of investor funds, (D) compensation to any person, (E) Defendant's qualifications to advise investors; or (F) the misappropriation of investor funds or investment proceeds.

C.      Enter orders barring Defendants Rai and de Mora from serving as officers or directors of certain public companies, pursuant to Section 20(e) of the Securities Act [15 U.S.C. §77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. §78u(d)(2)];

D.      Enter an order barring Defendant Rai from, directly or indirectly, including, but not limited to, through any entity owned or controlled by him, from participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Rai from purchasing or selling securities listed on a national securities exchange for his own personal accounts;

E.      Order Defendants Rai, de Mora, SVN Med, and NVS Med and Relief Defendant Cancer Check to disgorge, with prejudgment interest, their ill-gotten gains obtained by reason of the unlawful conduct alleged in this Complaint, pursuant to Section 21(d)(5) and (7) of the Exchange Act [15 U.S.C. §78u(d)(5), (7)];

F.      Order Defendants Rai and de Mora each to pay an appropriate civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)];

G.      Retain jurisdiction over this action to implement and carry out the terms of all

orders and decrees that may be entered; and

  H.  Grant such other further relief as the Court may deem just and proper.

**<u>JURY DEMAND</u>**

  The Commission demands a jury in this matter for all claims so triable.

DATED: January 15, 2026

        Respectfully submitted,

        /s/ Kathleen Burdette Shields
        Kathleen Burdette Shields (BBO# 637438)
        Brandon Sisson (BBO# 703947)
        SECURITIES AND EXCHANGE COMMISSION
        Boston Regional Office
        33 Arch Street, 24th Floor
        Boston, MA 02110
        Phone: (617) 573-8904 (Shields direct)
        (617) 573-4504 (Sisson direct)
        (617) 573-4590 (fax)
        ShieldsKa@sec.gov; SissonB@sec.gov