**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**SUMIT RAI; KIM DE MORA; SVN MED LLC; NVS MED INC.; and ONCO FILTRATION, INC.,**<br><br>**Defendants,**<br><br>**and**<br><br>**CANCER CHECK LABS, LLC,**<br><br>**Relief Defendant.** | **Civil Action No. 26-10159-FDS** |

**MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS TO DISMISS AND MOTION TO TRANSFER**

**SAYLOR, J.**

This is a case involving alleged violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a). Jurisdiction arises under 15 U.S.C. § 78u(d), § 78u(e), and § 78aa; and 15 U.S.C. § 77t(d)(1) and § 77v(a). Defendants SVN Med LLC, NVS Med Inc., Onco Filtration, Inc., and relief defendant Cancer Check Labs, LLC are medical technology companies. During the relevant period, defendant Sumit Rai was an officer of SVN Med, NVS Med, and Onco Filtration. He is currently the CEO of NVS Med, Onco Filtration, and Cancer Check Labs.

During the relevant period, defendant Kim de Mora was the CEO of SVN Med, the director of NVS Med, and the founder and VP of Onco Filtration.

The complaint filed by the SEC alleges that Rai, SVN Med, and NVS Med fraudulently used investor funds to pay for Rai's personal and unrelated business expenses, and that the scheme was aided and abetted by de Mora. The complaint also alleges that as a result, Cancer Check Labs received ill-gotten funds that must be returned.

Rai and the corporate defendants have moved to transfer the case to the Northern District of Texas. All defendants have moved under Fed. R. Civ. P. 12(b)(6) to dismiss the complaint for failure to state a claim upon which relief can be granted, or in the alternative, to require a more definite statement under Fed. R. Civ. P. 12(e).

For the following reasons, the motion to transfer and the motions to dismiss will be denied.

## I. <u>Factual Background</u>

The following facts and allegations are as set forth in the complaint.

### A. <u>Investments in SVN Med, NVS Med, and Onco Filtration</u>

Sumit Rai is a former venture capitalist. (Am. Compl., Dkt No. 49, ¶ 22). In 2019, he began soliciting investments in SVN Med, LLC. (*Id.* ¶ 24). The company's investment materials described its focus as cancer dialysis, creating technology that could filter more than twice an average patient's entire blood volume. (*Id.*).

Between 2019 and July 2021, SVN Med received $11 million from approximately 100 investors. (*Id.* ¶ 25). Those investments took the form of convertible notes. (*Id.*).

In February 2021, Rai incorporated NVS Med, Inc. (*Id.* ¶ 26). Between March and September 2021, he solicited investors to assign their convertible promissory notes that had been payable by SVN Med to convertible promissory notes that would be payable by NVS Med. (*Id.*).

All SVN Med investors agreed to those assignments. (*Id.*). On September 13, 2021, SVN Med became a wholly owned subsidiary of NVS Med. (*Id.*).

During 2021 and 2022, Rai solicited new investments for NVS Med. (*Id.* ¶ 27). Between September 2021 and October 2022, approximately 60 investors invested $8.1 million in the form of convertible promissory notes. (*Id.*).

In March 2022, Rai changed the name of one of the subsidiaries of SVN Med to Onco Filtration, Inc. (*Id.* ¶ 28). Rai and de Mora solicited its NVS Med investors to exchange their convertible promissory notes to ones payable by Onco Filtration. (*Id.*). As part of the exchanges, Rai and de Mora offered a four-fold increase in the value of their notes. (*Id.*). All investors agreed. (*Id.*).

In April 2022, Rai began soliciting new investments in Onco Filtration. (*Id.* ¶ 29). Approximately seventy investors invested $7.5 million. (*Id.*). Some of the investments were in the form of convertible promissory notes. (*Id.*). Others were in the form of Onco Filtration stock or options to purchase that stock. (*Id.*).

Approximately one year later, Rai asked Onco Filtration investors to agree to another promissory note exchange. (*Id.* ¶ 30). Effective as of September 1, 2023, Rai and Onco Filtration offered investors a 2.5-fold increase in the face value of their promissory notes if investors exchanged their convertible promissory notes for non-convertible promissory notes. (*Id.*) According to the complaint, Rai told investors that they did not have a choice in agreeing to this note exchange, stating that it was a “foregone conclusion.” (*Id.* ¶ 31).

The new promissory notes stated that investors had a four-year payment term, and that annual installment payments would be due beginning on December 31, 2024. (*Id.*). However, the new notes also allowed Rai or Onco Filtration to extend payout dates unilaterally. (*Id.*). Rai

exercised that provision and did not make payments to any investors holding the notes on December 31, 2024. (*Id.*).

In sum, Rai raised approximately $26.7 million from 180 investors. (*Id.* ¶ 32).

**B. <u>Investment Purpose</u>**

The Note Purchase Agreements provided to SVN Med investors in 2019 and 2020 stated that "[t]he proceeds of the sale and issuance of the Notes shall be used for general corporate purposes and working capital." (*Id.* ¶ 33). Rai indicated to SVN Med investors that their investments would be used in furtherance of the business. Specifically, in 2020, Rai provided both existing and prospective SVN Med investors with pitch materials that described SVN Med's business as the development of a medical device capable of filtering a patient's "entire blood volume" to remove circulating tumor cells, thereby inhibiting cancer metastasis. (*Id.* ¶ 34). The company stated that the investment proceedings from the $2 million in convertible notes would be used for research and development for the medical device, regulatory costs, salaries, professional fees, interest expenses, and general and administrative costs. (*Id.*). Rai and de Mora also informed at least three prospective investors that $10 million would be used for both animal and human clinical trials. (*Id.* ¶ 35).

Similarly, the Note Purchase Agreements provided to NVS Med investors in 2021 and 2022 stated that "[t]he proceeds of the sale and issuance of the Notes shall be used for general corporate purposes and working capital." (*Id.* ¶ 36). Again, Rai and de Mora indicated to NVS Med investors that their investments would be used to further the company's technology. (*Id.* ¶ 37). Specifically, they told investors that the company's goals for the fourth quarter of 2021 included drafting an FDA Breakthrough application. (*Id.*).

Finally, the Note Purchase Agreements provided to Onco Filtration investors stated that "[t]he proceeds of the sale and issuance of the Notes shall be used for general corporate purposes

and working capital." (*Id.* ¶ 38). Again, Rai and de Mora presented to investors that their funds would be used in furtherance of the business. Specifically, Rai, copying de Mora, emailed investors pitch materials that claimed that the company's pre-clinical process was "actively in process and on track to be completed th[at] year." (*Id.* ¶ 39). They also stated that they expected Octo's expenses in 2022 and 2023 to be primarily in the areas of research and development. (*Id.*).

### C. <u>Rai's Loan from Bank A</u>

On July 8, 2020, Rai took out a loan from Bank A, which provided him with a personal line of credit that could be withdrawn in an amount up to 95% of the value of the accounts that were pledged as collateral for the loan. (*Id.* ¶ 41). On the application, Rai stated that the purpose of the loan was "general liquidity purposes." (*Id.*).

Rai signed the loan application as the "pledgor" as well as the "borrower." (*Id.* ¶ 42). That was because a brokerage account owned by SVN Med was used as collateral, which, according to the complaint, was substantially funded by investor money. (*Id.*). In the loan application, Rai represented that SVN Med was a holding rather than operating company, and that he owned 100% of it. (*Id.*).

Both Rai and de Mora signed the loan agreement. (*Id.* ¶ 43). The loan represented that SVN Med authorized Rai to enter into the loan and pledged SVN Med's account as collateral for the loan. (*Id.*). According to the complaint, de Mora knew that Rai's statement about his 100% ownership stake in SVN Med was false because he was, at the time, the owner of 12% of SVN Med and had signed SVN Med's LLC agreement, which demonstrated that the company had at least six owners at the time of the loan. (*Id.* ¶ 44).

The loan agreement required Rai to pay interest on the outstanding loan balance at the end of each month. (*Id.* ¶ 47). According to the complaint, Rai often paid the accumulated

monthly interest by authorizing Bank A to take money from the pledged SVN Med account—an amount totaling approximately $680,000. (*Id.*).

According to the complaint, Rai also periodically drew on the loan from July 2020 to April 2023. (*Id.* ¶ 48). Specifically, approximately 75% of the funds in Rai's personal account at that time originated from the loan account. (*Id.*). During that time, Rai repeatedly informed staff at Bank A that the loan funds were used for his "general liquidity." (*Id.* ¶ 49). He also told bank staff that he used loan proceeds for his personal needs, such as renovating his home, buying a collectible car, and legal and entertainment expenses. (*Id.*). However, according to the complaint, Rai used the loan proceeds to pay about $2.3 million in credit card bills for himself and a business associate; give that business associate $5.1 million to spend on restaurants, nightclubs, and entertainment; purchase luxury vehicles for a "private elite social club in Manhattan" that Rai and the business associate were founding but that never opened; pay $1 million of the business associate's non-credit card debts; make equity investments in both SVN Med and Onco Filtration that increased his ownership percentage; pay $85,000 at strip clubs; and make a $22,500 loan to de Mora. (*Id.* ¶ 51).

At least once, Bank A contacted de Mora, as CEO of SVN Med, to seek his approval for loan withdrawals. (*Id.* ¶ 52). In October 2020, de Mora approved a cash withdrawal, but did not seek an explanation from Rai as to why the withdrawals were being made. (*Id.*). According to the complaint, throughout the period of time that the loan was open, the outstanding balance represented about 88% of the available cash balances of SVN Med. (*Id.* ¶ 53).

On April 6, 2023, Bank A demanded that Rai repay the loan, which at that point totaled approximately $10.6 million. (*Id.* ¶ 54). According to the complaint, Rai paid off the loan using

investor funds. (*Id.* ¶ 55). At the time, de Mora was an officer of Onco Filtration and signed off on the use of SVN Med investor funds to repay the loan. (*Id.* ¶ 56).

### D. Communications to Investors

According to the complaint, both Rai and de Mora made materially false and misleading statements to investors.

First, they made materially false statements about SVN Med's main brokerage account being pledged as collateral for Rai's personal loan. For example, in 2023, Rai was the point of contact for the outsourced CFO firm that provided services for SVN Med, NVS Med, and Onco Filtration. (*Id.* ¶ 57). According to the complaint, when bookkeepers from that company asked de Mora for details about using SVN Med's pledged account to repay Rai's loan, Rai told de Mora to say that the payment was a loan to Rai and that it could be booked as an asset of the company. (*Id.*). The existence of the loan was not disclosed to investors. (*Id.*).

Furthermore, one institutional investor, as part of its "confirmatory diligence," requested a copy of SVN Med's brokerage account statement. (*Id.* ¶ 59). According to the complaint, instead of sending that investor an accurate copy, Rai instead altered the statement to remove information showing that SVN Med's account was pledged as collateral for his loan. (*Id.* ¶ 60).

Another institutional investor required SVN Med to complete periodic "compliance certificates." (*Id.* ¶ 61). According to the complaint, on at least three compliance certificates dated July 27, 2020, September 11, 2020, and August 29, 2022, Rai, de Mora, and SVN Med concealed that SVN Med's brokerage account was pledged as collateral for Rai's loan. (*Id.* ¶ 62).

Second, de Mora did not disclose to investors that he also took a $50,000 loan from SVN Med on January 13, 2021; a $50,000 loan from NVS Med on November 8, 2022; and a $50,000 loan from Onco Filtration on July 18, 2023. (*Id.* ¶ 67).

### E. Profits from the Loans

In September 2023, Rai formed a new company named Cancer Check Labs. (*Id.* ¶ 69). Rai owns two-thirds of that company. (*Id.*).

In September 2023, Rai informed investors that Onco Filtration was planning to sell a test for diagnosing cancer from circulating tumor cells. (*Id.* ¶ 70). Rai told investors that sales were anticipated to start in January 2024. (*Id.*). According to the complaint, at the time of those statements, Rai knew that Onco Filtration would not be the company making sales of its product to the public. (*Id.* ¶ 71). Instead, Rai intended that Onco Filtration would sell its test supplies to Cancer Check Labs, with no documented obligation to pay for those supplies. (*Id.*).

Onco Filtration sold the tests to Cancer Check Labs. (*Id.* ¶ 72). According to the complaint, as of January 29, 2025, there were no documents reflecting that sale, such as sales agreements, invoices, or receipts. (*Id.*).

On July 30, 2025, Rai produced an "Exclusive Supplier Agreement" backdated to June 1, 2024. (*Id.* ¶ 73). That agreement provided that Onco Filtration could sell its products only to Cancer Check Labs, that Cancer Check Labs would pay Onco Filtration only 20% of the price for which Cancer Check Labs sold its cancer screening blood test to a customer, and that Cancer Check Labs had no obligation to pay Onco Filtration for the products it sold to Cancer Check Labs until the company became "cash flow positive." (*Id.*).

According to the complaint, Cancer Check Labs has received at least $915,000 in revenue from selling products manufactured by Onco Filtration. (*Id.* ¶ 74). However, as of September 2025, Cancer Check Labs has not paid Onco Filtration any funds. (*Id.*).

## II. Regulatory Framework

Section 17(a) of the Securities Act makes it "unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication

in interstate commerce or by use of the mails, directly or indirectly" to "(1) employ any device, scheme, or artifice to defraud," "(2) obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made," or "(3) engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a).

Section 10(b) of the Securities Exchange Act "performs a similar catch-all function and also extends coverage beyond securities sellers." *S.E.C. v. Tambone*, 550 F.3d 106, 121 (1st Cir. 2008). It makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of [SEC rules or regulations]." 15 U.S.C. § 78j(b); *see also Sec. & Exch. Comm'n v. Sharp*, 626 F. Supp. 3d 345 (D. Mass. 2022) ("The elements of an action for securities fraud under Section 19(b) of the Exchange Act . . . and Section 17(a)(1) of the Securities Act are substantially the same under the Supreme Court's precedents.").

The SEC must demonstrate that defendants acted with scienter for the purposes of Sections 17(a)(1) and 10(b). *Aaron v. Sec. & Exch. Comm'n*, 446 U.S. 680, 701-02 (1980). Negligence suffices for the purposes of Section 17(a)(2)-(3). *Id.*

## III. Procedural Background

The SEC filed the complaint on January 15, 2026. It subsequently filed an amended complaint on April 16, 2026. Rai and the corporate defendants have moved to transfer the case to the Northern District of Texas. All defendants have moved to dismiss the complaint for failure to state a claim upon which relief can be granted, or in the alternative, require a more definite statement.

## IV. Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), the complaint must state a claim that

is plausible on its face. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). When determining whether a complaint satisfies that standard, a court must "take the complaint's well-pleaded facts as true, and . . . draw all reasonable inferences in the plaintiff's favor." *Lowe v. Mills*, 68 F.4th 706, 713 (1st Cir. 2023) (quoting *Frese v. Formella*, 53 F.4th 1, 5 (1st Cir. 2022)) (citation modified). Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Médico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

Under Fed. R. Civ. P. 9(b), the standard for allegations of fraud and fraud-based claims is higher than the normal pleading standard. To survive a motion to dismiss, a counterclaim alleging fraud must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To satisfy the requirements of Rule 9(b), a pleading must identify "the specific who, what, when, where, and how" of the allegedly false or fraudulent representation. *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1327 (Fed. Cir. 2009). In addition, although Rule 9(b) requires that "intent, knowledge, and other conditions of a person's mind may be alleged generally," to survive review under Rule 9(b), a pleading must also "allege sufficient underlying

facts from which a court may reasonably infer that a party acted with the requisite state of mind." *Id.*

A motion for a more definite statement under Fed. R. Civ. P. 12(e) should be granted only if "a pleading to which a responsive pleading is allowed . . . is so vague or ambiguous that the party cannot reasonably prepare a response." "Rule 12(e) motions are disfavored 'in light of the availability of pretrial discovery procedures.'" *Vizcaino v. Isaac*, 2016 WL 1163652, at *3 (D. Mass. Feb. 2, 2016) (quoting *Cox v. Marine Mar. Acad.*, 122 F.R.D. 115, 116 (D. Me. 1988)). "The Federal Rules of Civil Procedure 'employ notice pleading, and, for this reason, motions for a more definite statement are not favored.'" *Id.* (quoting *Delta Educ., Inc. v. Langlois*, 719 F. Supp. 42, 50 (D.N.H. 1989)).

Because the motions to dismiss may impact the motion to transfer, the Court will address them first.

## V. Motion to Dismiss of Defendant Sumit Rai

Defendant Sumit Rai makes a series of arguments for why dismissal is warranted: (1) that the action is time-barred; (2) that the challenged transactions did not involve the sale of "securities"; (3) that defendants did not or could not have deceived investors; (4) that the successive note exchanges discharged prior notes and therefore preclude the claims; (5) that the complaint fails to plead allegations on a "transaction-by-transaction" or "investor-by-investor" basis in violation of Rule 9(b); (6) that the complaint fails to demonstrate a "nexus" between defendants' conduct and the pleaded securities transactions; (7) that the complaint improperly "group-pleads" defendants, again in violation of Rule 9(b); (8) that the complaint does not adequately plead scienter; and (9) that the complaint does not adequately plead entitlement to remedies. All of those arguments are without merit.

**A. <u>Statute of Limitations</u>**

First, Rai contends that the action is time-barred under 28 U.S.C. § 2462 because the "core alleged conduct"—namely, the bank loan—occurred in 2020. That is incorrect. Section 2462 provides that "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture . . . shall not be entertained unless commenced within five years from the date when the claim first accrued." The five-year limitations period begins to run when the "allegedly fraudulent conduct occurs." *Gabelli v. SEC*, 568 U.S. 442, 448-54 (2013) (rejecting the "discovery rule" as applied to SEC enforcement action). That means the complaint must plead fraudulent conduct that occurred within the limitations period, not simply factual allegations that are "only indicative of residual benefits from a much earlier violation." *See, e.g.*, *Sec. & Exch. Comm'n v. Sharp*, 626 F. Supp. 3d 345, 385 (D. Mass. 2022); *Sec. & Exch. Comm'n v. Cohen*, 332 F. Supp. 3d 575 (E.D.N.Y. 2018) (rejecting the "continuing violation" doctrine, as "the statute of limitations runs from when [d]efendants allegedly engaged in misconduct, not when they received compensation in connection with that misconduct").

The complaint clearly does so here. It alleges that Rai conducted a years-long scheme to defraud investors, culminating in the use of investor funds to repay his personal loan in 2023. Although Rai took out the personal loan in 2020, the complaint alleges that he raised funds from investors through July 2021 while misleading them as to how the funds would be used; misled investors about the marketing and sales strategy of Onco Filtration in 2023; misappropriated investor assets by drawing from the Bank A loan after January 15, 2021; and attempted to obscure his conduct by, among other things, executing a misleading compliance certificate and misleading the bookkeeper of SVN Med concerning the nature of the April 2023 payment to

Bank A.[1] Those are all well-pleaded discrete violations that allegedly occurred within the limitations period.

Furthermore, and in any event, the SEC seeks both injunctive relief and disgorgement in addition to civil penalties. The limitations period for those remedies is ten years. *See* 15 U.S.C. § 78u(d)(8)(B) (providing that the SEC may seek injunctive relief within "10 years after the latest date on which a violation that gives rise to the claim occurs"); 15 U.S.C. § 78u(d)(8)(A)(ii)(IV) (providing that the SEC may seek disgorgement within "10 years after the latest date of the violation that gives rise to the action . . . if the violation involves conduct that violates any other provision of the securities laws for which scienter must be established.").

The complaint thus alleges violations that are well within the applicable limitations period, and will not be dismissed as time-barred.

**B. <u>Sale of Securities</u>**

Rai further contends that the alleged misconduct involving Onco Filtration did not involve the sale of "securities" because the non-convertible notes issued and payable by Onco Filtration resembled commercial debt. That is incorrect. The complaint alleges that in 2023, Rai solicited Onco Filtration investors to exchange their convertible promissory notes for new non-convertible promissory notes, while failing to tell them that Onco Filtration would give away its technology to another company that Rai owned. That exchange involved the sale of convertible notes, which are unequivocally "securities."

Rai also contends that this Court should dismiss allegations concerning one of the institutional investors because the investor was "a lender not a securities purchaser." That is

[1] Certainly, at the remedies stage, this Court will have to assess what civil penalty is appropriate if Rai engaged in fraudulent conduct both before and within the limitations period. But that is a question of fact appropriate for resolution later in the proceedings.

likewise incorrect. According to the complaint, that investment was structured as a combination of debt financing and convertible promissory notes, which gave the investor rights to obtain warrants, the exercise of which would entitle the investor to shares equal to 1.7% of SVN Med. It is irrelevant under the statutes, which require only that the sale "involve" securities, whether the warrant was actually exercised.

**C. Alleged Lack of Deceit**

Rai contends that the complaint is deficient because transaction documents demonstrate "authorized proceeds use, subordination to bank debt, and cancellation of prior notes"—that is, evidence that Rai did not mislead investors. None of Rai's submitted documents, which include security agreements, promissory notes, and certificates of compliance, were attached to the complaint or are central to the SEC's claim. *See Watterson v. Page*, 987 F.2d 1, 3 (1st Cir.1993) (noting that, in ruling on a motion to dismiss, court may consider "documents the authenticity of which are not disputed by the parties, . . . official public records, . . . documents central to plaintiffs' claim; or . . . documents sufficiently referred to in the complaint"); *see also Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) ("[I]f the document merely creates a defense to the well-pled allegations in the complaint, then that document did not necessarily form the basis of the complaint."). Therefore, resolution of the question whether Rai's actions were contractually permitted, or otherwise not deceitful, is not appropriate at this stage.

**D. Alleged Discharge of Prior Notes**

Rai contends that the successive note exchanges discharged prior notes and therefore preclude the claims. That is nonsensical. A change in investment form or corporate structure does not erase fraud in hindsight. Indeed, as the SEC notes, the complaint alleges that Rai

utilized shifting corporate forms specifically in order to find new ways to raise capital through fraudulent means.

**E. Alleged Failure to Plead Specific Transactions**

Rai contends that the complaint must be dismissed because it fails to plead allegations on a "transaction-by-transaction" or "investor-by-investor" basis, in violation of the specificity requirement of Rule 9(b). That is incorrect. Fed. R. Civ. P. Rule 9(b) does not require such detailed pleadings. *Powers v. Bos. Cooper Corp.*, 926 F.2d 109, 111 (1st Cir. 1991) (stating that Rule 9(b) requires only "specifying in the pleader's complaint the time, place, and content of the alleged false or fraudulent representations"); *see also id.* (affirming motion to dismiss, as fraud count was "almost wholly conclusory, and . . . lacking in specifics").

**F. Alleged Failure to Plead the Required Nexus**

Rai contends that the complaint fails to demonstrate a "nexus" between defendants' conduct and the pleaded securities transactions. Specifically, he contends that the appropriation of investor funds to repay Bank A's loan to him was simply "a bank collecting on collateral under a contractual pledge," that by the time Bank A was repaid, various exchanges had "severed" their relationship with investors, and that the investor to which he had allegedly provided false compliance certificates was a "lender," not a "securities purchaser." For the reasons explained above, those arguments are without merit. The complaint clearly connects Rai's misconduct to three sets of securities violations, arising out of investments in SVN Med, NVS Med, and Onco Filtration. The complaint also alleges multiple specific misrepresentations in connection with those transactions.

**G. Alleged Improper "Group-Pleading"**

Rai contends that the complaint improperly "group-pleads" defendants in purported violation of Rule 9(b). Certainly, under Fed. R. Civ. P. 9(b), the complaint is "expected to

specify the who, what, where, and when of the allegedly false or fraudulent representation." *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 30 (1st Cir. 2004). It clearly does so here. To the extent that it indicates that Rai, SVN, NVS Med, and Onco Filtration all engaged in conduct together, it is to demonstrate that they acted in concert because Rai exercised control over all three companies.

**H. Alleged Failure to Plead Scienter**

Rai contends that the complaint does not adequately plead scienter. Specifically, he contends that the complaint merely describes "pro-enterprise conduct, disclosed interest expense, repeated exchanges at higher face values, continuing patent prosecution, CLIA certification, and later commercial revenue." It is conceivable that the evidence will show that Rai's conduct was entirely permissible commercial behavior. But whether that is true is a question of fact. At this stage, it is sufficient if the complaint's allegations, taken as a whole, support a plausible inference that Rai acted with scienter. *See, e.g.*, *Sec. & Exch. Comm'n v. Sharp*, 626 F. Supp. 3d 345, 388 (D. Mass. 2022) (stating that under Rule 9(b), "malice, intent, knowledge, and other conditions of the mind of a person may be averred generally"). Here, the complaint pleads, with specific factual allegations, that Rai deliberately misled investors and misappropriated their funds. That is easily sufficient to plead scienter.

**I. Alleged Failure to Plead Entitlement to Remedies**

Finally, Rai contends that the complaint does not plausibly plead entitlement to remedies. Much of this argument is duplicative of his other contentions—specifically, that the complaint does not plead a "transaction-specific" violation and that conduct prior to the five-years limitation period is "barred." As explained above, the complaint pleads a plausible claim under Fed R. Civ. P 12(b)(6) and 9(b).

Accordingly, the motions to dismiss of defendant Rai for failure to state a claim or to require a more definite statement will be denied.

## VI. <u>Motions to Dismiss of SVN Med, NVS Med, and Onco Filtration</u>

Defendants SVN Med, NVS Med, and Onco Filtration have moved to dismiss the complaint on the same nine grounds as Rai, plus three others. The nine overlapping grounds are without merit for the reasons set forth above. The three additional arguments are likewise without merit.

First, all three companies contend that the complaint does not sufficiently allege the existence of an actor whose conduct is attributable to them for the purpose of potential securities laws violations. That is wrong. The complaint clearly pleads that Rai controlled SVN Med, NVS Med, and Onco Filtration at all relevant times, and that he was an officer of all three companies. His alleged misconduct is therefore imputed to the companies. *See, e.g.*, *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006) ("[C]ourts have readily attributed the scienter of management-level employees to corporate defendants." (collecting cases)).

Second, all three companies contend that they did not receive any money or property from the alleged violation. That, too, is wrong. 15 U.S.C. § 77q(a) prohibits entities from "obtain[ing] money or property by means of any untrue statement of a material fact." That simply means that SVN Med, NVS Med, and Onco Filtration must have received money or property as the result of a fraudulent act. Here, the complaint pleads that SVN Med and NVS Med raised money from investors based on misstatements concerning how their money would be used. The complaint also pleads that Onco Filtration obtained property based on misrepresentations concerning the company's marketing and sales strategy. That satisfies the statutory requirement.

Finally, NVS Med and Onco Filtration contend that they cannot be held liable for conduct that predates their formation. They misread the complaint. It clearly identifies allegedly fraudulent conduct attributable to each company, including misleading statements and misappropriation of funds.

Therefore, the motions of SVN Med, NVS Med, and Onco Filtration to dismiss for failure to state a claim or require a more definite statement will be denied.

## VII. <u>Motion to Dismiss of Kim de Mora</u>

Defendant Kim de Mora contends the complaint must be dismissed because it does not plead facts sufficient to establish an "aiding and abetting" violation. Specifically, he contends that the complaint fails to plead that de Mora had awareness of the specific primary violation, and that he "actually and effectively" furthered it.[2]

That is incorrect. Aiding and abetting liability requires that a person "knowingly or recklessly provides substantial assistance to another person in violation of [the Securities and Exchange Acts]." 15 U.S.C. § 78t. The First Circuit has explicitly rejected a requirement of actual knowledge. *Sec. & Exch. Comm'n v. Gasarch*, 168 F.4th 11, 33 (1st Cir. 2026) (rejecting defendant's argument that "jury instructions needed to include a knowledge standard as opposed to a knowingly and recklessly one"). Instead, the legal standard is as follows: the government must prove (1) that the principal (here, Rai) committed a primary violation; (2) that de Mora "understood that [his] role or conduct was part of an overall activity that was improper"; and (3) that de Mora "knowingly or recklessly provided substantial assistance to that violation." *Id.* In order to plead "substantial assistance," the government must show that de Mora "in some sort

[2] de Mora also contends that the complaint is time-barred under 28 U.S.C. § 2462. For the same reasons set forth above, that is incorrect. The complaint, at the very least, pleads that de Mora "aided and abetted" in April 2023 by providing final sign off for Rai to use investor funds to repay his personal loan. That is a discrete alleged violation within the limitations period.

associate[d] himself with the venture, that [he] participate[d] in it as in something that he wishe[d] to bring about, [and] that he [sought] by his action to make it succeed." *S.E.C. v. Apuzzo*, 689 F.3d 204, 212 (2d Cir. 2012) (citing *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949)).

As set forth above, the complaint here sufficiently pleads a primary violation—that Rai committed securities fraud when he misled investors and used investors' funds to pay off a personal loan. The complaint also pleads facts sufficient to show that de Mora knowingly or recklessly provided substantial assistance by "participating in it as something he wished to bring about." Specifically, the complaint contends that he signed the loan application while knowing that SVN Med assets would become collateral for Rai's personal loan; submitted a false certificate to an institutional investor while knowing that SVN Med's assets were pledged as collateral for Rai's loan; told investors that their money would be used for clinical trials while knowing it would be used instead for Rai's loan; and approved large cash withdrawals by Rai for personal purposes.[3] That is sufficient to state a claim for aiding and abetting.

Accordingly, the motions to dismiss of Kim deMora for failure to state a claim or to require a more definite statement will be denied.

## VIII. <u>Motion to Dismiss of Cancer Check Labs</u>

Relief defendant Cancer Check Labs contends that the complaint does not plausibly allege that it holds property traceable to the alleged wrong, or that it lacks a legitimate claim to what it received. That, too, is incorrect.

[3] de Mora contends that the complaint must plead "specific conduct by de Mora that 'actually and effectively' furthered the alleged primary violation," for "each round" of securities offerings, and identify a communication in which de Mora specifically acknowledged that investor funds were being misappropriated. That is also incorrect. As stated above, the complaint must merely plead that de Mora participated in the overall scheme and that he plausibly could have been aware of misappropriation. *See Apuzzo*, 689 F.3d at 212. As explained above, it clearly does so.

Under 15 U.S.C. §§ 78u(d)(5), courts have the authority to order disgorgement against relief defendants "who are not accused of having violated the securities laws themselves, but who are believed to be in possession of profits from such violations." *Sec. & Exch. Comm'n v. Sanchez-Diaz*, 88 F.4th 81, 87 (1st Cir. 2023). Courts may order disgorgement in a securities enforcement action when the relief defendant "(1) had received ill-gotten funds; and (2) does not have a legitimate claim to those funds." *Id.* at 87-88. The complaint does not need to satisfy Rule 9(b)'s heightened pleading standard as to claims against relief defendants. *See, e.g.*, *Sec. & Exch. Comm'n v. Merrill*, 2021 WL 1117280, at *5 (D. Md. Mar. 23, 2021).

The complaint more than clears that bar here. In essence, it alleges that Rai misappropriated a significant portion of invested capital by promising investors that Onco Filtration would sell a test to screen for cancer from circulating tumor cells, while in reality, Onco Filtration instead sold the test to Cancer Check Labs, a company that Rai owned. Thus, Cancer Check Labs received property to which it did not have a legitimate claim. Therefore, the complaint plausibly alleges that Cancer Check Labs received "ill-gotten" property. *See, e.g.*, *SEC v. Merrill*, 2022 WL 541161, at *3 (D. Md. Feb. 22, 2022) (ordering disgorgement by relief defendant of proceeds from sales of vacation homes "purchased with the proceeds of . . . fraud").

Cancer Check Labs contends that the complaint fails to plead that it directly received investor funds. That is beside the point. The complaint needs only to plead that Cancer Check Labs received money to which it had no legitimate claim. Here, the complaint seeks disgorgement based on Cancer Check Labs's receipt of technology developed using the proceeds of Rai's fraud.

Cancer Check Labs further contends that plaintiff improperly seeks "gross-revenue disgorgement untethered to net profits," and that it has a legitimate claim to the property because

the Exclusive Supplier Agreement reflected a commercial agreement, and the company has a "commercialization role." That may be the case—but those are a questions of fact, not appropriate for resolution at this stage.

Accordingly, the motions to dismiss of Cancer Check Labs for failure to state a claim or to require a more definite statement will be denied.

## IX. Motion to Transfer Venue and Sever Claims

Finally, Rai and the corporate defendants contend that venue should be transferred to the Northern District of Texas under 18 U.S.C. § 1404(a), or in the alternative, that their claims should be severed from the ones against de Mora under Fed. R. Civ. P. Rule 21 and subsequently be transferred to the Northern District of Texas.

### A. Change of Venue

First, Rai and the corporate defendants contend that 18 U.S.C. § 1404(a) compels transfer of venue to the Northern District of Texas.

Under 15 U.S.C. § 78aa(a), the governing statute through which the SEC asserts this enforcement action, a proceeding may be "brought in the district wherein any act or transaction constituting the violation occurred." *S.E.C. v. Spencer Pharm. Inc.*, 57 F. Supp. 3d 127, 137 (D. Mass. 2014). The act "need not constitute the core of the alleged violation and need not be illegal, so long as it represents more than an immaterial part of the alleged violations." *Id.* (citation modified).

If the conditions of § 78aa(a) are met, the parties requesting transfer under § 1404(a) bear a heavy burden. "The plaintiff's forum choice should rarely be disturbed." *Mercier v. Sheraton Int'l, Inc.*, 935 F.2d 419, 424 (1st Cir. 1991) (citation modified). As a result, "the moving defendant . . . must establish that the private and public interests weigh heavily on the side of trial in the foreign forum." *Id.* (citation modified). "The defendants have the burden to establish

that, on balance, the interests of justice and convenience weigh heavily in favor of transfer." *Systemation, Inc. v. Engel Indus.*, 992 F. Supp. 58, 64 (D. Mass. 1997) (citations omitted).

Courts in this district ordinarily consider the following factors in determining the most appropriate forum under § 1404(a): (1) the relative convenience of the parties, (2) the convenience of the witnesses and location of documents, (3) any connection between the forum and the issues, (4) the law to be applied, and (5) the state or public interests at stake. *Holmes Group, Inc. v. Hamilton Beach/Proctor Silex, Inc.*, 249 F. Supp. 2d 12, 17 (D. Mass. 2002).

As a preliminary matter, Rai, de Mora, and the corporate defendants engaged in acts or transactions in Massachusetts sufficient to establish venue under § 78aa(a). During the relevant period, de Mora was a resident of Massachusetts. And during at least part of the period at issue, the principal places of business of SV Med, NVS Med, and Onco Filtration were in Woburn, Massachusetts.

The question, then, is whether Rai and the corporate defendants have satisfied the heavy burden of demonstrating that the interests of justice and convenience "weigh heavily" in favor of transfer. They very clearly do not. First, although the Northern District of Texas may be a more convenient forum for Rai and the corporate defendants—now that they are located in Dallas—the District of Massachusetts is a more convenient forum for the SEC (and, presumably, for de Mora, who is still a resident of Massachusetts). Second, as plaintiffs note, the witnesses reside nationwide, rendering no jurisdiction more particularly convenient than another in that regard. Third, there is a substantive connection between Massachusetts and the issues, as many of the acts alleged by the complaint were committed by the parties in Massachusetts when they resided there. Fourth, because this is an SEC enforcement action arising under federal securities laws, the law to be applied will be federal and therefore the same regardless of where in the United

States this action is litigated. Finally, there are no specific public interest factors that would weigh in favor of Texas; Rai and the corporate defendants have not identified any administrative difficulties adjudicating this case in Massachusetts, nor any local interest in adjudicating this case in Texas.[4]

Accordingly, the motion to transfer venue to the Northern District of Texas will be denied.

### B. Severance

In the alternative, Rai and the corporate defendants contend that their claims should be severed from de Mora's, and then transferred to the Northern District of Texas, because de Mora's "pre-cutoff compliance certificates involve different witnesses, documents, and legal issues than the post-cutoff allegations against Rai and the corporate defendants."

Certainly, the court may sever claims if parties are joined improperly—that is, if the conditions for permissive joinder under Fed R. Civ. P. Rule 20 have not been met. Rule 20 states that defendants are properly joined if "(1) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (2) any question of law or fact common to all defendants will arise in the action." As long as parties meet this test, courts generally do not sever claims "unless other considerations such as avoiding prejudice and delay, assuring judicial economy, or safeguarding fundamental fairness counsel otherwise." *Abraham v. Allen Mello*

---

[4] Rai and the corporate defendants also seem to raise a personal jurisdiction challenge to litigating the case in Massachusetts, stating that there is a "Fifth Amendment due process constraint" because Rai has had no contacts with Massachusetts. That is irrelevant. This action arises under federal-question jurisdiction. Therefore, the Fifth Amendment requires only "minimum contacts" with the United States. 28 U.S.C. § 1331. That standard is easily met in this case.

*Dodge, Inc.*, 2011 WL 4625686, at *3 (D.N.H. Oct. 3, 2011) (citing *Acevedo v. Allsup's Convenience Stores,* 600 F.3d 516, 521 (5th Cir.2010).

Without question, de Mora is properly joined in this action. The complaint alleges that de Mora aided and abetted Rai and the corporate defendants in the violation of federal securities laws. Therefore, the SEC's right to relief against de Mora arises out of the same series of transactions and occurrences as its right to relief against the other defendants, and there will be common questions of law and fact that govern both actions.

Regardless, even if severance were proper, transfer under § 1404(a) is not. As explained above, all defendants have ties to Massachusetts, and the § 1404(a) factors—which consider witness location, convenience for plaintiff, and the public interest—do not weigh in favor of transfer. Severing the claims against de Mora from the action does not change that calculus.

Therefore, Rai and the corporate defendants' motion to sever their claims and transfer them to the Northern District of Texas will be denied.

## X. Conclusion

For the foregoing reasons,

1. the motion of defendant Sumit Rai to dismiss for failure to state a claim upon which relief can be granted, or in the alternative, require a more definite statement is DENIED;
2. the motion of defendant SVN Med LLC to dismiss for failure to state a claim upon which relief can be granted, or in the alternative, require a more definite statement is DENIED;
3. the motion of defendant NVS Med Inc. to dismiss for failure to state a claim upon which relief can be granted, or in the alternative, require a more definite statement is DENIED;

4. the motion of defendant Onco Filtration, Inc. to dismiss for failure to state a claim upon which relief can be granted, or in the alternative, require a more definite statement is DENIED;

5. the motion of defendant Kim de Mora to dismiss for failure to state a claim upon which relief can be granted, or in the alternative, require a more definite statement is DENIED;

6. the motion of relief-defendant Cancer Check Labs, LLC to dismiss for failure to state a claim upon which relief can be granted, or in the alternative, require a more definite statement is DENIED;

7. the motion of defendants Sumit Rai, SVN Med LLC, NVS Med Inc., Onco Filtration, Inc., and Cancer Check Labs LLC to transfer the case to the Northern District of Texas is DENIED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
United States District Judge

Dated: November 20, 2026